Our next case is number 24-1874, In Re Wawa Inc. Data Security Litigation. Mr. Shulman? Good morning, your honors. With the court's permission, I'd like to reserve five minutes for rebuttal.  Wawa I directed the district court to attend to two major considerations when reassessing class counsel's attorney's fee request. First, Wawa I instructed the court to place greater weight on the claims rate because the funds are reversionary in this case, and especially because class members had to do more than raise their hands to get a payment. All right, Mr. Shulman, let me interrupt you right there because we're now here to review the agreement that was ultimately approved by the district court, correct? Correct. And with respect to Reverter, what appears in that particular, that is the latest and maybe the fourth, if I remember correctly, settlement agreement, the approved one? Correct. With the third amended agreement, that provision was eliminated. All right, so how are we here to review a Reverter provision that no longer exists? Well, it was our submission, and so there was a dissent in Wawa I that thought that it was no longer relevant, obviously, but the majority thought that it still had relevance. We know what Wawa I said, and notwithstanding the frustration of the district judge upon remand of the case to her when she asked at the first conference, I thought over and over again about what we're going to do here today. I've wondered as well what we're going to do here today. The Reverter is an artifact of the past here, is it not? It is. There was, the district court did make a mistaken finding that it wasn't an intentional inclusion. Really? That was a finding of fact, was it? It was. All right, and how do we review findings of fact of district judges? That would be for clear error, Your Honor, but it's the intentionality. Correct, correct. It is for clear error, and in fact, didn't one of counsel actually state, and this was not a testimonial proceeding, but it was counsel as officers of the court making representations to the court that this was an oversight. Wasn't that the import, if not the precise language of counsel before the court? No, Your Honor. At this, in front of Wawa I panel, I believe it was. I'm asking, Wawa I panel made no determinations as to facts. We don't do that on appeal. Judge Prater made a determination, which you're now saying is clear error, so I'm trying to find how it was clearly erroneous. Well, it was clearly erroneous for a number of reasons, which we lay out at thirty-five to thirty-seven of the opening brief. One way that it was clearly erroneous was the intentionality was written right into the settlement agreement that the fee was to be treated separately in the class's recovery. Then there were representations made both to the lower court and this court on appeal that it was a negotiated term. I cited to the exact minutes of oral argument where plaintiff's counsel, appellate counsel at that time, made that representation. It was Wawa, and this court came to the conclusion that it was used as a gimmick to insulate counsel's fee from scrutiny of attorneys, of objectors. It's still a historical artifact, isn't it? It's not what we're reviewing today because it doesn't appear in the approved final agreement as to counsel's fees. That's correct. There were several errors, of course, beyond that, in our view. Factors that the court either improperly included in its analysis or overlooked, such as the clear sailing provision that was acknowledged throughout the litigation to be a clear sailing provision. How was it acknowledged? Let me start, though, before I ask you that. There is no prohibition, per se, against the inclusion of clear sailing provisions in agreements and class actions, is there? There's no bright line prohibition. That's correct, under this court's precedent.  For sure. What do you do with that? Where's the wrong? It needed to be considered as a factor. This court should adopt the same rule that Samsung adopted from the Tenth Circuit, that the inclusion of these red flags is reason to resolve doubts against looking to the hypothesis. So Samsung used it to resolve doubts against plaintiff's attorney's billing records. And that provision, that principle of law comes from where, Mr. Shulman? That clear sailing and kicker or red flag, that's a common law interpretation that courts, including this one, even though there's no… Well, you said they should adopt. Correct. Yes, it is a reading of Rule 23 that we're asking this court to adopt, which the Ninth Circuit adopted in Briseno, which the Seventh Circuit adopted in Pearson. It comes right out of… You were active in Briseno, too, weren't you? We did represent the appellant in Briseno. Yes, that's correct. And also the appellant in Pearson. Rule 23 judging is sort of a common law endeavor because of the language of fairness and reasonableness being having some… I beg to differ. I would say that there's a lot more of equity in Rule 23 than there is in common law, but there certainly is some of both. It has its equitable roots, for sure, and Wawa 1 relayed that history of Rule 23H. And equity, in our view, doesn't help the argument of class counsel that it was appropriate to make claims made available because when they were appointed, they promised that we were going to do a better job of getting money to class members. Well, the claims made available issue is also one that you've argued. Am I right? Certainly. We view that as the crux of the issue. But this court has never said that that's an incorrect way of looking at it, right? That, to me, from a meta perspective, is the most interesting part of the case is that you seem to take issue with the fact that in claims available or settlement monies made available cases, there's a pretty woeful track record of conversion from made available to putting the money into the pockets of the aggrieved. Correct. Correct. Okay. All right. And that's an interesting argument, but what could this panel do about that in this circuit at this time? So here's what I think this panel can do. The Wawa 1 language, right, says that claims actually paid out is this, quote, unquote, sensible starting line. So we view that as a presumption, unless other countervailing factors are present. Okay. And the court below said that the injunctive relief was a countervailing factor. But in our view, that was a legal error because it did not obligate the defendant to do anything. But if it hasn't, this court made clear that claims available is valid. That's our current jurisprudence. So this panel can't do anything about that in this case. Well, Wawa 1 says that it's discretionary. But what this panel can do is lay out the factors that the court should and should not consider. And we think that's where the error occurred. Well, we hear an abuse of discretion. For including improper factors, the injunctive relief, yes, that would be. But since it's available to the district court and the district court, in the first instance, I might not have chosen that kind of relief. But it's available to the district court and she chose it. Why is that an abuse of discretion? It's not. It's an abuse of discretion to look at factors that the court should not have looked at. It should not have used injunctive relief that was illusory. It obligated the defendant only to do what it was already doing. I think that's a real overstatement to say it's illusory. I think you made some some persuasive arguments that it was in the offing. You put a lot into the record to show that the company was working on this, that obviously for business goodwill purposes, the company was interested in cleaning up the mess. But it's also true that the relief ordered by Judge Prater here gave you another layer of protection, gave all customers of the company another layer of protection because of its court order. Do you deny that there's an important distinction between voluntary amelioration of a problem and a court order that requires amelioration? In some cases, that could be an important distinction, but not here. Wawa spent millions of dollars to transition its point of payment to the EMV system, which had begun, as we put into the record, it had begun before the litigation was even filed, let alone the settlement. Let's talk about the filing of the litigation. Let me go back further than the remedy, Mr. Shulman, to demonstrate just how non-illusory this remedy of injunctive relief was. This was pled ab initio as a B2 and B3 action, B2 being for injunctive or declaratory relief, right? I think that it's correct, Your Honor. I'm so sure it was correct. I've gone back and read the complaint. So from the very start, plaintiffs were seeking injunctive relief, and they got it in the settlement. And as Judge Hardiman's question has pointed out, not only was there value in having an order, meaning therefore that this was enforceable, that order included an obligation of some kind of follow-up on the part of Wawa as to the effectiveness of the new regime, the new electronic regime, was there not? It was some sort of an annual reporting. Yes, kind of auditing, if you will, right? That it was occurring, yes. But there was no evidence. Wawa submitted multiple declarations into the record, and they said we would have never – the language was very well wordsmithed. We would never have agreed to be bound, not that there was any inclination that they would reverse – revert a process that took them a million dollars, millions of dollars to voluntarily impose on themselves. I just think common sense suggests that that's not – okay, but even if you disagree – oh, go ahead, Your Honor. Thank you. Sorry. Well, let me go to perhaps what one might refer to as the nub of this dispute or what was earlier on. The word collusion earlier in the proceedings had been used, but you have expressly, as I recall it from reading the various transcripts, the various stages here, you have eschewed any suggestion that there was collusion. Am I correct? That's correct. We've consistently fled it as a matter of a conflict of interest that exists when class counsel is seeking a fee from a common fund. Right. So that's what I've been trying to understand. I understand that conflict of interest was either a fallback position or was your actual position. So what was the conflict? Do you think there is a conflict every time just because of the nature of class actions and that the nature of class actions that result in settlements as to attorney's fees creates a conflict? There's no way to avoid it. Yes, at the time of fee. But that doesn't mean right. The plaintiffs take the position that the rule 23A4, which we don't argue was wasn't satisfied here is how you resolve conflicts of interest. But it's not the case that every time plaintiffs seek a fee, the class has to be decertified. That's that's ridiculous. A4, you're referring to the adequacy requirement, the four prongs of Section A. And, of course, the district court had to say that that had been satisfied in order to have ultimately approved certification. It also does, though, tell us something about the assessment that the district judge made of the competency and experience of the attorneys involved here who were appointed. Am I right? Sure. Sure. OK, sure. But the conflict that we're talking about is resolved by the district court scrutiny into these side agreements as well. Well, one calls them the clear sailing, the fee segregation. The district court's finding that there was no clear sailing violated the mandate. It violated judicial estoppel principles. How did it violate the mandate when Wawa One said that the district court was to scrutinize the presence of side agreements, including the clear sailing clause?  I read that as saying that there is a clear sailing, the presence of clear sailing, not that that issue can be revisited. What's the definition of a clear sailing clause? When the defendant agrees not to object to a given attorney's fee request. And in this case, where did they do that? They used that agreed to language a dozen times. They agreed to not object? Yes. They agreed to the payment. And it was conditioned on. Show me. Quote me the language that says we agree not to object. So the settlement language use the language of cooperation. Cooperate. Cooperate. We agreed to cooperate in the preparation of the fee request. It was the exact same language it used with respect to the final approval papers. The class council. Are you arguing that an agreement to cooperate is tantamount to an agreement not to object in this context? That's the only in what context? That's in the context of this settlement agreement. Why? Because that's how they use the same cooperation language with respect to final approval. And the motion for approval of the settlement. Otherwise, if you read it as then. I guess I don't understand. You know, I have to confess. I don't think I ever litigated a class action case on one side or the other, but I confess to not understanding. The notion that an agreement to cooperate means the same thing as an agreement not to object. Because my lay person's understanding of cooperate means we might need to produce documents. We might need to make people available. We might have to do all kinds of things consistent with cooperation. A statement we won't object to me. I understand better because that's a legal term. That means we're going to walk into court and we're going to say, judge, no objection. That's a very different thing than agreeing to cooperate. It certainly could have been written that way. That's not how it was written with respect to the final approval. Judge Prater was very well aware of your attempt to find synonymous cooperation and an agreement not to object. And she was very disparaging of it, in fact. Was she not? She was disparaging of that. She thought that somehow, but she also said that there are multiple representations that the fee was agreed to somehow was not a clear sailing. And I just ‑‑ That's not what I'm asking. I wanted to bring to the fore the fact that she was well aware of what you were attempting to do semantically here. And she just didn't buy it. I don't buy it either, and I express the doubt that Judge Hardiman has. In fact, she, on more than one occasion, during more than one of the hearings, emphasized to all who were present that a negotiation is just that. And a negotiation necessarily has to be about cooperation to some extent. Or to a great extent. Did she not? Well, she did not address the argument that the parallelism argument that we're making with respect to Wawa's duty to cooperate with final approval. If her interpretation of cooperation was simply to be non‑belligerent, if that was correct, Wawa would have had the right to object to final approval, which seems absurd. And under Pennsylvania contract law, we should not take an interpretation of contract that would lead to an absurd result like that. I'm sorry, Judge Hardiman. Go ahead. I assume that you agree with Judge Hardiman's question a few minutes ago. That the cooperation here really was necessary for Wawa to have, or rather for the plaintiffs to have, a considerable amount of information that could be obtained only from Wawa as to customers, as to pricing, and related matters. Wouldn't you agree with that? That it was necessary for them to have that information? Right. How do you even know the size of the class, as large as this one was, as amorphous as it was, without having information regarding credit card transactions and other related matters that were in the records of Wawa, but certainly not within the records of the plaintiffs? I'm not saying that there's ‑‑ we're certainly not saying that there's anything wrong with that sort of provision, but the parties behaved. There was no indication ‑‑ the parties made multiple representations that the fee was agreed to. If Wawa interpreted it as something other than a clear sailing provision, there would have been no economically rational reason why they would not have objected to fees at the appropriate time. Do you think the fee was egregious? Because I've seen an awful lot of fees in class actions that are huge by comparison to this one. I mean, this fee, there was $80,000 in cash sent to the class. There was ‑‑ the claims rate in this case was three hundredths of one percent. Now, granted ‑‑ That gets back to the meta issue. Yeah. That's an argument for these cases not being brought. It seems like you're making a broadside against, you know, coupon cases or, you know, cases like this where, you know ‑‑ We're arguing that these are factors that should be considered. These are factors that Wawa 1 laid out, whether the quality of the compensation is ‑‑ whether it's an all cash settlement or a non‑cash settlement. Look, if the measuring stick is the amount of money that actually went into the pockets of the aggrieved, this fee is plainly disproportionate. It's wildly out of whack. But that's not what our case law says the measuring stick is, right? A common fund here was over $12 million, and they got about 25 percent of it, which is quite common, right? You're ‑‑ well, this court's case law doesn't ‑‑ rejects a bright line rule that it's always going to be the amounts claimed as the measuring stick. But it doesn't ‑‑ No, but it ‑‑ right. But the amounts claimed can ‑‑ I mean, the ‑‑ it's not the amounts claimed, but it's also the amounts that are theoretically available, even if history shows only 2 or 3 percent of the aggrieved parties actually redeem the coupon or the gift certificate or the ‑‑ Well, that is not the approach of this circuit either, that that is the bright line. And certainly not ‑‑ that was why Wawa 1 reversed, because the court thought that that was the bright line approach, that you have to consider all amounts made available. So the question now is what factors should the court have considered? We lay out the four factors, it's 41 to 45, that we think the court ‑‑ No, but made available may be considered, right? I guess I'm just not understanding why you're focusing on the actual conversion rate, when under our jurisprudence the actual conversion rate seems to not be the be‑all and end‑all. Well, I don't think that ‑‑ I think that any ‑‑ the language from Wawa 1, in our view, is fairly clear that it's not going to be the case in every case that made available is the correct measure. In fact, it says that the sensible starting line is the actual claims payout. So in our view, that's a presumption, unless there are factors that counsel ‑‑ In your view, but the law ‑‑ our case law doesn't say it is a presumption, which is certainly a term within the law that has a distinct meaning. It does not say presumption. It's a sensible starting line. And the court on remand considered the claims rate to no greater extent than it did the first time. Two quick questions, please. Number one, would you agree that there is a significant literature out there on the very low claim rates in consumer class actions of this type? Yes. And we think that that is ‑‑ we think that that is actually a public policy reason why the district court got it backwards to say that because of that dynamic that we should look to the amount made available. Because it's encouraging litigation that doesn't result in compensation. I understand that it is a public policy issue, and it's one for either the rules committees to take up, which as far as ‑‑ which I can assure you they're not right now, or for Congress to take up as they did when they passed CAFA. One final question. Can I speak to that just very quickly? Because I think that the 2018 amendments do make that change. That's the function of E2C2, requiring courts to look at the effectiveness of the claims process. I'm very familiar with that amendment. In fact, it came about after an opinion that I wrote in the NFL concussion case because of a few other factors. But let me return to my final question, and that is, there was a lodestar crosscheck here, too, as to the final fee. Do you give no weight to that? The court did not ‑‑ the court was doing a percentage, a base percentage method. It didn't have ‑‑ as we argued, it didn't even have the information that would be required, the billing records that would be required to do an actual lodestar approach. This court has said on numerous times that the lodestar method cannot trump or displace the percentage method. So I do ‑‑ and I do ‑‑ and, for example, Judge Posner's opinion in Redmond has good language about the hours not being able to control the question of reasonableness of the allocation. All right. You've gone well past the time, primarily because of our fault. No, mine. Mine. I take it all. My apologies. Mr. Admeson. Good morning, Your Honors, and may it please the court, William Admeson on behalf of the Meekie State of Iowa and 15 other states. I want to start by talking about the measuring stick issue that this court was talking about just a minute ago. Before you get to that, counsel, if I could ask, you were, as is required by CAFA, notified early in the game, I think, that you had not proposed to object at any point prior to this appeal, have you? No, Your Honor, and under 1715F of CAFA, the Attorney General's, I don't want to call it a failure, but choice not to object or just nonobjection doesn't waive any rights at any point in the process. I didn't suggest that it did, but it seems to me that given what was seen as a salutary benefit of this notice to the states that Congress embodied in CAFA, it might be a good idea, and you might share this with your client and others, that a lot of good could be done by intervening earlier in the game or by entering the stage earlier in the game than at this stage. I certainly agree that the intervention of Attorney Generals is important, and that's why we're here today, because of the importance of this issue to 16 states that joined the amicus brief. And the issue that's important to the 16 states is this measuring stick issue. Do we measure attorney fees based on the amount made available or based on the amount that actually goes to consumers at the end of the day? And what does our case law say about that? 101 says that the court has discretion, but I think importantly, 101 didn't say that that choice is unrevealable. 101 said that a district court has discretion to choose between either one. So just because a district court chooses made available over claims made because it's a Wednesday, I think everyone would agree that's an abusive discretion. Was there an abusive discretion here, and if so, why? Exactly right, and that's the point that I'm getting to. There was an abusive discretion here because the district court relied on injunctive relief that was essentially meaningless. In the district court's opinion, essentially the choice between made available and funds paid to consumers, that choice turned solely on injunctive relief and the district court's valuation of it. So the district court called it the central feature and central achievement at least four times in its opinion, and on page 40 of the order, the district court made very clear that the reason why the district court chose the measuring stick that it did was because of this injunctive relief. Would you say the injunctive relief was literally illusory or just that it was overvalued? I think it's illusory, Your Honor. How can it be illusory when it was pled for at the very beginning as a cause of action? I think the record at 1394 gives a picture that illustrates our position for why it's illusory. So the record at page 1394 is a picture, and that's a picture of one of Wawa pumps, and that picture shows Wawa implementing the EMV technology. That EMV technology is the chip processors that Your Honors might be familiar with. If you have a credit card, you have to insert it. That's industry standard, and that picture of Wawa implementing the EMV, that's in January of 2020. That article says that Wawa expects to be done by October 2020. The settlement wasn't inked out until the first version of it wasn't inked out until February. So clearly the company had taken remedial steps before the injunction. That's fact, right? Was the district court clearly erroneous to find that Wawa's customers had lost confidence in the company because of the data breach? I don't think the conclusion that if a company loses a bunch of your data, that might affect customers. The district court found that Wawa's customers lost trust because of the data breach. Was that clearly erroneous? The effect on the customers, I will agree, that's not clearly erroneous, but I think what's really important is the value of the injunction. So it's one thing to say this is how consumers are affected. How do you know what the value of an injunction is? If a Wawa customer, if we agree that the customers lost trust because of the data breach, how can we value what a typical customer, we're talking about millions and millions of customers, how do we know what a typical customer would think about these two different scenarios? Company says, trust us, we're fixing it. Federal court says, I've entered an injunction forcing them to fix it. It's your position that those are, the distinction between those two scenarios are immaterial to the customer. Respectfully, Your Honor, I think we view the injunction a little bit differently. It's not an injunction by the court saying to fix it. I think the record is clear and paragraph 16 is the only time where- So what does the injunction require? It's two years. It's a two year injunction. What does it require? I didn't ask the time. What does the injunction require? It requires Wawa to implement and continue implementing the EMV security procedures, which it had already spent millions of dollars on.  Okay, so your view is that because the company starts to implement those procedures, a federal court order requiring them to continue and to complete that process is worthless. Yes, although I would phrase it differently. Respectfully, Your Honor, I would say a federal court order that requires Wawa not to spend millions of dollars. I understand why non-lawyers might think federal court orders are worthless, but it's a little stranger for lawyers to say federal court orders are  And Your Honor, I think it's important here. I'm not pushing against the value of the court order, but I think it's important. And Prudential made this point that it's the crux of the inquiry, as Prudential says, is to separate out the benefit from class counsel and the benefit that exists independently. And here, so applying the crux of the inquiry, what the court order is doing, the marginal effect of the court order, the actual value that's attributed to class counsel. We don't know what that is. And it's plaintiff's burden to prove it. And it's the district court's job to evaluate that and make a decision. And we get great deference to that decision. And she did. And she acknowledged the difficulty and really even the impossibility of putting an actual dollar amount on it. So is the abuse of discretion here in giving any amount at all to a remedy that you have labeled as illusory or is the abuse of discretion some amount that was attributed to this, which has not been expressly set forth? I think that the abuse of discretion is the district court's choice to use this injunctive relief as quote, especially valuable and quote, a significant benefit. The district court valuation of it, the district court didn't put a dollar value on it. What if it didn't use the adjectives? What if it just said valuable and benefit? I think that the way the district court's order reads, which the district court said it gave great weight to this factor. And on page 40, the district court essentially says this injunctive relief is the only reason it's choosing one measuring stick over the other, that the district court's decision to use that injunctive relief. And I understand that this court might view the injunctive relief perhaps differently than, than the coalition of 16 states does. But just like the Kobe case and just like the Briseño case where yes, there was a court order in those cases. And in Kobe it was a court order to make sure a debt collector continued using a changed voicemail. And the court in Kobe said, Judge Watford said, well, no, the court order, isn't having any marginal difference there because the company already, already changed its voicemail. Well, if this judge had made a similar conclusion, applying our deferential standard of review, we might be inclined to agree. It sounds like a lot of what we're quarreling about here is who gets to make the call. And as you can tell, perhaps the panel is, is deferential to district judges making these calls and the standard of review is, is rather deferential. I'll end with one point, Your Honor. And that's the Briseño case. In the Briseño case, the ninth circuit held that it was reversible error for the district court to not value the injunctive relief. So I think, I think at step one, even if this court might find it difficult to value the injunctive relief, the ninth circuit said, well, it's reversible error not to value this injunctive relief. And I think that's important because here the district court didn't say, oh, this injunctive relief is part of the fund, put a dollar value on it, and then give class counsel credit that way. The district court did something very unique, which is use injunctive relief to make a decision about how to value the injunctive relief. And so I think our position here is that it doesn't, it's not all it did, right? Didn't the district court also note that the changes that occurred in the various iterations of the settlement resulted in a higher conversion rate and more money. It's still, it's still very low in terms of a hundred, but it, it went from, you know, something like 0.35 up to over 2%, if I remember correctly. The district court in its section that analyzed that the measuring stick decision did consider the claims rate. But I think the fact that the district court said that the injunctive relief quote weighed heavily in favor was the central feature, the central achievement, especially valuable. I think that in error in valuing the injunctive relief or even considering the injunctive relief is, is an abuse of discretion. So it doesn't really matter that the district court might've said for, I think it was like a page and a half, a different factor, that that's reversible error on it. So I'm just like the ninth circuit said in Briseño, if the district court isn't putting a number on it, isn't doing the work to value this, that, that that's reversible error. And I think even this court. So the district court had to put a number on the injunction. That's the crux of your argument. No, you're not. Well, it's it, it tracks essentially Briseño is that, um, the district court erred in its valuation. And even if the district court, what was its valuation, uh, especially valuable, the district court didn't put a number on it. And I think that that number, you know, our position is, is looking at this. It's an injunction. And the common fund of 12 million. Uh, the common fund should be 6 million. Um, based on the claims made. Uh, I think there's different, different definitions of the common fund here based on the measurements. Council, wouldn't your position being taken at this juncture before us, the better directed to the advisory committee on civil rules, at least as to the valuation of an injunction, since the committee is well familiar with rule 23, it's various iterations. Uh, uh, B, uh, B2 has been with us since I think 1966, uh, the, the, the need to play some kind of valuation can easily, well, I won't say easily could appropriately be placed within the text of the rule. Why aren't you there? Um, so I, I would agree with you that, that a fix in the rules would certainly be very valuable. I think the reason that we're here is because in Wawa one, this court said district courts have the discretion to choose, to choose the measuring stick, but this court hasn't provided guidance for when a district court abuses its discretion in making that choice. And the reason we're here today, why shouldn't the guidance be case by case adjudication? And that may very well be the principle that this court applies. Um, and our position would be that in this case, the injunctive relief is essentially valueless because while we'll spend, it all comes back to illusory. All right. You, you were clear on that. You, you agreed with your, your friend at the table. Yeah. You're, you're, your view is that the injunctive relief here was illusory. Yes, sir. Okay. All right. Thank you very much. We appreciate it. Let's hear from Mr. Duncan. Next piece of court, Matt Duncan, on behalf of plaintiffs at police. Um, the court has made many of the factual points that I was going to emphasize today. And so I'm going to briefly shift gears. He'll head on with injunctive relief. Um, and if I may, uh, quick three points that we think resolved this appeal. And, and then I'm happy to answer any questions, remaining questions the court has. Um, first of all, the issues here are indeed narrow. This case, this appeal turns on to fact bound post remand questions under wall, wall one that deal with a portion of the district court's fee analysis. And so all other rule 23 requirements here are met not withstanding my friend on the other side's allusions to structural conflicts of interest by class council or the fairness of this deal or the noticing claims process or the notion that these are coupons, which they are not, there's a finding that they are not, none of those are live issues in this. Well, help me out with that. Cause I was the one that raised the coupon word. I guess I was referring to that sort of generically. If, if someone pushes a $5 credit to my app, it feels like a coupon, but I guess technically it's not. No, it's, it's fair, your honor. And members of this panel are well aware of the history of coupon settlements and why they were problematic kind of forcing consumers to buy things they don't want. But there are other contexts where, uh, a gift card style. Okay. Benefits. Yeah. So the problem, the problem with a coupon technically speaking is that you're going to give me $5 off, but now I got to go spend a hundred dollars at your store here. You're just giving me a, you're giving me five bucks, uh, on my, on my mobile phone. And there are findings here about the repeat nature of the customer base. These cards are, you know, Wawa has lots of small ticket items, et cetera. But the conversion rate is still very high. It's off. Well, the claims rate, let's talk about that too. Yeah. I mean, most people, but I assume your argument is that, that even if it were true, you don't believe this, but even if one believes it to be true, the cases like this shouldn't be bought, brought, excuse me, because it's much ado about nothing. Nobody really gets much of a benefit and the lawyers make millions of dollars. That's not the law. I think it's not the law. And I would push back on the premise too, your honor. I think, I mean, this is a case, there's a finding that this was a good deal, a good settlement that benefited the class. And I want to explain why that is. This was a real data breach. This exposed real class members information, a relatively small percentage of them. Yes. Suffered actual fraud, but this settlement delivered meaningful relief to those that did suffer fraud as to the rest of the class whose data was exposed, but didn't actually suffer fraud. That's where the injunctive relief kicks in. That was, that was the, that was the careful tailoring, Mr. Duncan, if you will, of the three tier system that, that came out of the settlement. Yes, your honor. And I think that explains why after judge Prater had lived with this case for so long and kind of dug into that, she viewed that the remedy here as relatively elegant in the way relief was tailored in that respect. And if I could, your honor, the injunctive relief, I really want to dig into this because I think it reflects that the perils and no disrespect to the States, of course the States have an obligation to say what they're saying in these cases. It reflects the perils of amici coming in and arguing for clear factual error, not having participated in the trial court as judge Smith pointed out. I mean, if you dig into the facts on the injunctive relief and compare what Mr. Frank says, the injunctive relief provided with what it actually provided, the distinction is stark and it supports judge Prater's actual finding that this is not a loose or injunctive relief. And let me briefly walk through it. Mr. Frank says that, well, after the data breach, Wawa was already in the process of upgrading its gas pumps to chip reader cards. Okay. And the Wawa's board had set aside $25 million for security upgrades that Wawa's management may or may not spend for unspecified things. Well, the settlement in this case provides much more specificity and a court order and things in addition to all of that. And so, for example, Wawa was required by court order to hire an independent security consultant on an annual basis to perform a review. Wawa was required to perform what's called in this business, penetration testing, testing for its security vulnerabilities to address those to the extent they came up. Wawa was required not just to upgrade its gas pumps to chip readers, but all of its in-store security had to be upgraded in terms of encryption and chip readers. That became court enforceable. Wawa had to document all of this and update class council periodically on its progress. Well, their argument was, is I think all that was in process and it was all going to happen anyway. But you can't just say that your honor. There are no facts in the record that suggest that. You're asking us to draw the inference. Correct. And I guess your response is maybe it would have happened anyway, but the fact that there's a court order forcing it to happen is takes it to another level. That's correct. And my other response, your honor, is judge Prater looked at all of this, considered this argument made factual findings to the contrary. And I could keep, I could go on and on. Does the record show we've already sunk all these costs into these remedial measures? It doesn't have. It does not. I mean, At most the record shows that some of that money was already going out the door, but ultimately Wawa spent $70 million at least on security upgrades. My colleague from Wawa could maybe speak a little bit more to that. And judge Prater relied on that fact as well. In addition, there have been no security breaches at Wawa since these measures went into place. And so there's a whole cocktail of factual support that supports the district court's bottom line finding on this. Yeah. Well, There's a pretty good argument on the other side that if a company wants to stay in business, when there's a data breach, they're going to clean up the mess, regardless of whether the class action lawyers come over the hill. That's a fair point, your honor. And that I have no doubt that Wawa would have done things on its own, whether this case existed or not. But as you yourself pointed out the difference between aspirational press releases and a court order requiring specific things is meaningful and real. And that's what judge Prater found here. I think. Is it realistic, Mr. Duncan, to also intuit that the board here would have certainly foreseen the class actions, as Judge Hardiman put it, coming over the hill, just about the same time that they ordered this, this work on improving the technology that the sophisticated business people know that that's inevitable. I think as a practical matter, that's correct, your honor. I mean, it's not an argument we relied on to say that the litigation itself triggered all of these voluntary remedial measures. We haven't made that argument. I think as a practical matter, it's probably true, but we think there's more than enough in all of that. So on the, in the fact, in the record about to support judge Prater's finding on the value. One thing I wrestle with here is there's so much speculation. How do we even apply our differential standard review here? Without making it look like it's just a total abdication to the district court. I disagree, your honor. I think that if you look concretely at the findings throughout this case, what supported a finding of adequacy of representation in the first instance, what supported a finding of settlement fairness in the first instance, none of which is in dispute at this stage. And then post remand the exhaustive findings of no collusion. We think that closes the book on the clear sailing and reversion issues. And was this real, was this actually a clear sailing clause? What was, was our decision in Wawa one. Precisely accurate in all of its nomenclature, your honor. I I'm not going to criticize Wawa one. I mean, we have treated every word of that opinion as if it had, we have to cross every T and dot every I on remand and comply with everything. I think it's a factual matter. In the end, judge Prater's finding is correct. There was not a contractual matter here, a traditional clear sailing clause, but our opinions seem to suggest there was, well, I think what the opinion did is the way I read the opinion, whatever it's worth, you all read your opinions better than I do. We're going to send this back anyway, because the district court thought that it had to apply a funds made available denominator. And so that was legal error. The court Senate back the panel, Senate back for that reason and said, you know what, while we're at it, we have some concerns about this clear sailing and reversion thing, by the way, your honor, that hadn't been briefed in Wawa one. I mean, it wasn't even raised as an issue in, in Mr. Frank's list of issues. The panel was mining the record. The panel had seen something that it gave a concern. And I think it makes perfect sense. If you do that and you're going to remand for another issue anyway, you'll say, Hey, take a look at this clear sailing, take a look at this reversion. That's the way we read Wawa one. And then judge Prater did exactly that. And the deep end of the facts. What's your definition of clear sailing is the same as Mr. I think it's what Wawa one said. It's if there's an agreement not to object to a field and no such agreement exists. And they argue that cooperation is tantamount to not object. And I think that's wrong for two reasons. I, your honor made the point. Earlier. I think if you read the plain language of that provision says cop cooperation to provide information. That's all this was, we said this in our brief, that's the only reason for that provision was we knew for a fee petition. In addition to final approval, we had to gather information about Wawa gift card claims claims rates, sort of the value of the injunctive relief provisions, what it's doing on security, et cetera, et cetera. We knew we would need information. That's why the provision is written that way. It says cooperate to provide information. That's all. Mr. Duncan hasn't this court previously set forth a definition of a clear sailing agreement. In fact, the definition that I believe was cited in one-on-one. Yes, that's correct. That's correct. It's it's, you know, and I think that, I think your question, your honor touches on a broader point here, which is, and this is a point. Judge judge Smith made earlier too. There's no categorical rule against clear sailing provisions. And I mean, this is look, I'm a, I'm coming out of academia. I've spent the last year, six years as a law professor. And I'm of the view, and this is neither here nor there for this case, the clear sailing provisions in some cases benefit class members. That's neither here nor there. That's an academic debate. This court's rule is that if clear sailing clauses are shown to have no collusion, there's no issue. And so judge Prater looked. Did a deep dive on the terms of the provision, the history of the provision gave Mr. Frank an opportunity to cross-examine those involved. And now the findings are definitive. There was no collusion. And we think that's the end of the matter on all things, clear sailing and reversion here. Mr. Duncan in talking about the work that judge Prater did on this case. And I, we certainly don't want to take any kind of ad hominem approach as to what any particular judge has characteristically done or how that judge is viewed, but the record alone here. And I've read the transcripts of every one of the sessions before her. Judge Prater was thoroughly engaged. Would you agree with that? I mean, I go back to, to the May 5, 2021 preliminary approval hearing and she raised, I don't know whether you were present at that or not. You were not at the microphone, but, but she raised a long list and I'm not going to bore everyone with that list right now. Everyone can read it. She raised a long list of issues and questions that she had. She did her own digging. Did she not from the start? She did your honor. And I was not involved in this matter. And that the trial court level, I did. I knew judge Prater for a very long time and everything you say rings true about the way she carried out her duty in every single case. And, you know, I think ultimately your honors, I think that where that leaves us in the end of this case is this court's wise and long settled approach to class action, attorney fee issues, you know, recognizing correctly that every one of these cases poses its own complexities and difficulties. This court for years for decades has given trial courts, the discretion's considerable discretion to manage all those issues, to evaluate whether a particular settlement is good for a class in light of the merits of the case, in light of the risks of the case, to evaluate over time, the quality of class counsel's work from the beginning of the matter to the end. Can you, can you imagine a situation where the claims made available denominator would be inappropriate compared to the actual value? Yes, your honor. I can. I think for example, a matter where there was, where there was no injunctive relief, right? I do believe that the judge Prater was correct to find this to be valuable injunctive relief. That's one factor that justifies the funds made available approach as opposed to the, the, the alternative. So I do think that's, I do, there are plenty of circumstances where it has to be discretionary in that sense. And so, you know, I do think that longstanding principle of committing these matters to the sound discretion of smart committed trial judges that decides this case. Judge Prater was an exceptionally experienced and capable judge. She did exactly what this court asked her to do on remand gathered all the evidence on the two issues that got sent back, reviewed it independently, made exhaustive findings. And, and we think this court should affirm. So unless the court has further questions. Thank you, Mr. Duncan. Thank you. Mr. Parks. Thank you. And good morning, judge Hardiman, judge Porter and judge Smith by TV. May it please the court. I'm Greg parks for defendant. Wawa Inc. Also an Appley here. I asked for three minutes to cover for three points. First is that the only issue on this appeal that is properly considered by the court is the amount of attorney's fees awarded to class council. Some of the amicus brief in places talks about vacating the entire approval of the settlement. That should failed in 2022. Judge Prater made the decision in April of 2022, that the settlement here was fair, reasonable, and adequate to the class. At that point in time, the only objector who remains standing here today, Mr. Frank had withdrawn the objection to the settlement itself. And that's in the record at docket two 76. And before this court on JA nine 93, and Wawa one acknowledged that on 85 F fourth seven one seven, that the objection to the settlement itself had been withdrawn. The only other objector was that a Wawa employee and his wife who subsequently withdrew their objection, although it had very little to do with the issues we're talking about today and abandoned their appeal. At this court stock at 2020 or 22 dash 1743. Number 27. So I listened very closely to my friend, Mr. Magnuson. I don't hear him talking about vacating the entire settlement. So I'm confident that we all are aligned, that that issue is not here and was not appealed. And that the only real issue is under 23 H, whether the district court appropriately applied its discretion on remand from Wawa one turning to those factors. The second point I wanted to make was about the gift card. And to your point, judge Hardiman, this is not a coupon because there are lots of things that customers could buy at Wawa that are less than $5. And that the classic example was judge Becker's example in GM trucks, where class members got a $1,000 certificate towards a truck that at that point costs $20. In fact, I think the record showed the average purchaser spends maybe less than five. That's correct. Your honor. And that there were 3000 items at Wawa that they're less than the $5. And I think about 10,000 items. So I think judge Prater's findings about the gift card, not clearly erroneous. It was also clear that 97.5% of the Wawa gift cards are value of the Wawa gift cards are actually used. My, my friend, Mr. Amundson and his brief says that that doesn't apply to promotional gift cards, to give cards that are given out. That only applies to gift cards that are purchased for value that people want, but that's not correct. The record before the district court, and this was on the final approval hearing docket two one three in this case, the district court's record at J a six one five, it was clear that that 97% statistic applied to both gift cards purchased for value as well as those that were given out promotionally. So I think the district court's finding that these gift cards are, are valuable given the nature of the particular gift cards and the large loyal customer following that Wawa has. And the fact that this is a class of Wawa customers, many of whom go to Wawa twice a day or, or at least every day, every week. That was a sensible solution to the, in terms of the injunction. Based on what's in the record. Can you tell us what. Portion of the relief. That Wawa planned to implement. Prior to the litigation prior to the injunction. Compared to the portion that, that came afterwards. Your, your honor. I, I think that. Most of it candidly were, were things that while I did in intend to implement before the injunction came. But it would may have been after the lawsuits were filed. And this goes to judge Smith's point that at the time, the board approved the $25 million that was in a meeting in February, the record will show the lawsuits had already been filed in December and January. So it is true that while I knew those lawsuits were coming. I knew that they were coming. I knew that they were coming. But I, I would say your honor, as to those things, by the time we entered into the settlement agreement, Those things were already in flight. What was not in flight was agreeing to them as a matter of an injunction. Which is why I think judge Prater's finding that that's valuable to the class. Matters because the vast majority of this class did not suffer any harm for most of these people. They use their card at Wawa. Nothing happened after this data breach. And so for those people, their main thing they were worried about was can I still use my credit card at Wawa? And I think judge Hardiman made a good point. It's kind of one thing for the company to say, we've done it. It's another thing for a district court to say, I've looked at it. I've enjoined it. And by the way, you Wawa have to follow up with the plaintiff's lawyers. And there was a plaintiff's lawyers, a colleague of, of my friend here. Who followed up with me literally every quarter to say, Hey, I need that declaration. I need it from you to understand that we you've done everything you're supposed to be doing. And I was sure that he would have told judge Prater. If there was any problem with respect to the things that Wawa was supposed to be doing. It's fair to say that as corporate counsel, you'd have, you would have had more latitude. In terms of. Remedying the data breach. If there weren't a court order requiring you to do an injunction requiring you to do certain things. No judge Hardiman. I don't think that. I think the, the, the injunction required us to do certain minimum things. We could certainly do things beyond that. And I could tell you for sure. Wawa has done things beyond that. And it's my friend's suggestion. Thanks to Wawa's good efforts. There have not been another Wawa data security incident. As I walk, knock on wood, that I say that. The last point I do want to make is I agree with the observation before and with all due respect to the panel decision and Wawa one, this is not a clear sailing clause. This is not a clear sailing clause. The clear sailing clause is that what we see in paragraph 78 through 82. Are not that I, as a, a class action lawyer who I do. Class action settlements frequently. A clear sailing clause is one that says I, as a dependent, I'm not going to object. I'm not going to say a word. I'm not going to speak against. Class councils application for attorneys fees. This didn't say that. This said that I would cooperate. And we did in providing information that they would need. To prepare their petition in paragraph 78. And if ordered while I would agree or would pay. The amounts that the court order. So that's more of a separately negotiated fee. Rather than a clear sailing agreement that we agreed to release to the class. And then we had a negotiation over attorney's fees, which really operated as a cap on the amount of attorney's fees. That the class could obtain. And that was important both to me as counsel for Wawa. And frankly, I think it's important to the class because. Having obtained $35 million worth of injunctive relief. And a $12 million common fund. The plaintiff's lawyers could have come to the court and said, this case is worth $47 million. This, this claim or this settlement is worth $47 million. We're entitled to a quarter of that. So by limiting themselves to $3.2 million, which was a number that at that point, They told me was below their lodestar. They limited themselves to a reasonable amount that was favorable to Wawa. And also favorable to the class. I guess the concern might be that the word cooperate. Stone forward might be used as sort of a dark. Dark. Term of art. You know, that means we want to object. I suppose your honor, but to Mr. Shulman's point. I mean, I think that's a good point. If there was a point at which the claim. A group of class counsel made a fee agreement that was clearly unreasonable. The defendant would have every economic objection. They're a. They've asked for way too much.  and so the absence of something that prevented a defendant from doing that, I think would. Would prevent the word cooperate from, from being a dark pattern like that. I also do think that paragraph 78 makes it very clear that we're cooperating. In connection with class counsel, preparing their petition. So to judge Hardiman's point, we need to provide them information about the class. Mr. Parks. In fact, either. The paragraph 78, or I think maybe it was actually on the record. During one of the in court sessions, the type of information, the specifics as to that information was also made clear. Was it not? The class needed information. Regarding the usage of the good gift coupons needed information concerning even what would amount to something that is reflective of the numerosity of the class. There were various types of information that were mentioned. So this was not just a vague suggestion of cooperation. The cooperation was directed toward obtaining certain specific points of information. Was it not? That's absolutely correct. Judge Smith. And that's the way the parties executed it. And I think judge Pratt are very appropriately saw firsthand that the information that Wawa provided to class counsel came to fruition and came to her in the course of these approval proceedings, things like the gift cards have a 97% usage rate. Things like here, here's the information as it relates to Wawa's improvements of data security. Those are things that necessarily had to come directly from Wawa. Thank you. Thank you, Mr. Parks. All right, Mr. Schulman rebuttal. Do your honors and hope this isn't another 30 minutes of five minutes into 30. But if it is, that's perfectly fine. I wanted, I do want to hit on. A lot of the relevant issues that keep being discussed. I'll start with the injunctive relief issue. The Wawa in the, in, in the plaintiffs are asking this court to adopt a rule that if the parties codify existing practices, pre-existing remedial measures, that can create compensable settlement value. And that rule is just an invitation to illusory abusive settlements. It's why the ninth circuit rejected that role in Kobe. The seventh circuit rejected that role in Reynolds, where it says, you must look at the incremental difference. Between the settlement codification in the pre-existing. What was already on offer? On the clear sailing point. I want to read from page. Very quickly from page 33 of our brief. When this. When this court at oral argument in Wawa one asked. Both counts counsel for both parties. What the benefit. For the clear sale. What benefit clear sailing provided. Of course, neither council because neither of them throughout the litigation said no clear sailing didn't exist. They didn't say that. What they said was class council responded. I suppose the benefit could be there'd be fewer briefs filed that. It was probably just a matter of streamlining the process. And Mr. Parks responded. It was certainty as the amount of the attorney's fees, We could then negotiate and agree upon the amount of attorney's fees. That wall would be willing to pay. That's the definition of a clear sailing agreement. They use this agreed to payment language a dozen times. And I say that 32. Of the opening brief. That at the very least, even if your honors. Think that that was an incorrect interpretation of paragraph 78. It's binding judicial estoppel. They won final approval. Of the settlement on that basis. And the district court's failure to consider that as part of the cap. A consideration in the question as to whether to look at amounts made available or amounts. Actually claims was error because that was a factor that. That this court and Wawa one pointed out that it should consider. It's by that erroneous finding. It didn't consider that. And they make no arguments. They only argue on appeal that it didn't exist. They don't say that if it did exist, it wasn't prejudicial to the ultimate decision. That the factor again, another factor singled out. By the, the, by the, the wall, one opinion. The, the fact that. The difference in the quality of compensation. This was a settlement where even if there was massive identity theft. The most of the class could have gotten is $1 million in cash. Because of how the caps worked. Eight of the $9 million. Was was non-cash gift card relief. And they looked to the 96, 7.5. The gift cards were readily convertible into cash. And well, it does, it does seem that the air of cell phones has made these things more likely to be redeemed. Especially if you're a regular customer who has the app, they push the. The gift cards to the app. Right. That's true. So it's not very difficult to open your app and check out at a, at a wall one. It might not show that that that's fair, your honor. And we didn't make a specific 17, 12. Coupon argument for partially that reason. But we do think that then it's still not, it's still not cash. And it should be a consideration. Nobody's used the kids. Don't use cash. It's not Venmo. It's not Dell. It's different than that. And the evidence on the record with this 97.7. With the 97.5 evidence was based on cards that were bought and purchased. It was, there was no, there was no record evidence of what would the claims rate be for cards that are for value that is pushed out without a solicitation for, from class members. And the, we, and our objection cited the studies that say that there's promotional coupons are a one to 3% redemption rate. Now, granted those weren't gift cards and that was an older study, but it was, it, you know, it had the feature of being promotional rather than something that's asked for, which was the 97.5% figure that they submitted. So that, that was another factor that we think should have weighed to look at the actual amounts and district court didn't appear to have done that. I welcome. Oh, oh, on. The discretion point, obviously this court allows some discretion, but this court still has to call the game by the right rules. That's the Supreme court's decision in Fox. A fee fee case. And we think that looking to the improper factors omitting necessary factors is the abuse of discretion. All right. Thank you to all four council court. We'll take the matter under advisement. Judge Hardiman. Could we have a transcript of this argument?  Thank you. Order that a transcript be produced and. Okay.